# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 16, 2000 Session

## STATE OF TENNESSEE v. ARNOLD K. WARD, JR.

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-298-66     Timothy L. Easter, Judge**

---

**No. M1999-00357-CCA-R3-CD - Filed December 14, 2000**

---

The appellant/defendant, Arnold K. Ward, Jr., appeals as of right from a judgment of conviction and sentencing imposed by the Williamson County Circuit Court. Upon jury conviction for attempted murder second degree and assault, the trial court imposed sentences of eleven (11) years for attempted murder second degree and eleven (11) months and twenty-nine (29) days for assault. The trial court ordered the sentences to be served concurrently. In his appellate issues, the defendant asserts that: (1) the indictment for count one is defective; (2) the defendant was denied his right to compulsory process; (3) extra-judicial communication during the trial between a witness and a juror contaminated the proceedings; (4) there was insufficient evidence for which a rational trier of fact could find the defendant guilty; (5) the defendant was convicted of a charge that does not exist under Tennessee law; and (6) the defendant's sentence is excessive. After a review of the entire record, we find the appellate issues without merit and affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

L. TERRY LAFFERTY, SR. J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Eugene Honea, Assistant Public Defender, Franklin, Tennessee, for the appellant, Arnold K. Ward, Jr.

Paul G. Summers, Attorney General & Reporter; Lucian D. Geise, Assistant Attorney General; Jeff Burks, Assistant District Attorney; and Robert Hassell, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

In count one, of a three count presentment, the Williamson County Grand Jury accused the defendant of attempted murder first degree of James R. Brom on December 29, 1997. In count two, the defendant was accused of aggravated assault of James R. Brom. In count three, the defendant was accused of assault of Frances Jackson. After a two day trial, the jury found the defendant guilty

of attempted murder second degree as included in the first count and guilty of assault in count three. The jury did not return a verdict to the offense of aggravated assault in count two.

## HISTORICAL BACKGROUND

James Robert Brom testified that on December 29, 1997, the defendant and Jeffery Burns came to his home on Vaughn Road in Hickman County. During the visit, Brom, the defendant, Burns and Bruce Prince, the victim's brother-in-law, smoked a "joint" and drank some beer. Brom stated that about 4:00 p.m., they left his home and bought a 12-pack of beer and proceeded to the home of Frances Jackson, the defendant's girlfriend. The defendant lived with Jackson on Fisher Road in Williamson County. At Jackson's mobile home, they drank beer and listened to music for several hours. However, Burns drank vodka. Brom stated that he did not smoke any marijuana at the Jackson trailer. Brom testified that the defendant left to get some more beer, and upon his return the defendant received a telephone call from someone who needed their car towed. The defendant cursed the guy on the telephone and Brom told the defendant, "that's not no way to run a business." Brom testified that the defendant went into another room to hang up the telephone and returned with a gun. Brom stated that he told the defendant, "put the g-d gun away, before you hurt somebody." The defendant shot Brom in the shoulder and said, "I'll blow your M-F head off again." Brom testified that he was shot twice, once in the left side of his head and in his left shoulder. Brom stated that he said, "call 911, there's someone walking down the road that's been shot." Brom testified that he woke up in Vanderbilt Hospital where he spent three days. The doctors would not remove the bullet in his left lung because it was lodged too close to his heart. Brom stated that there were no threats made prior to the shooting and indicated that the defendant was upset that Brom did not go with him to get some beer.

During cross-examination, Brom denied taking any pills or smoking marijuana at Jackson's trailer. Brom estimated that he was shot between 7:30 and 8:00 p.m. Before being shot, Brom stated that he heard four to five shots and afterwards two or three more shots. Brom testified that he was sitting on the couch and that the defendant was pointing the gun at him, talking to him, and there was no chance to defend himself.

Jeffery P. Burns, age 32, testified that he has been a paraplegic for eleven (11) years. He had been beaten with a baseball bat. He stated that he is the defendant's cousin and that he has known Jackson for approximately two years. On December 29, 1997, he met Brom and Prince for the first time. Burns stated that he spent about five hours with the defendant, Brom and Prince. During this time, he drank vodka, they drank beer and everybody took some pills (Valium, Loratab, Percoset and crack cocaine), and smoked some marijuana. Burns estimated that he and the defendant had been drinking and taking drugs for about three days. Burns confirmed that he was with the defendant when they picked up Brom and Prince and smoked some marijuana. Upon their return to Jackson's trailer, Burns was sitting in his wheelchair by the front door. After a couple of hours, the defendant left to get some more beer. Upon the defendant's return, the defendant and Prince got into an argument about "business." The defendant went into another room and obtained a gun. The defendant shot twice into the ceiling. Prince got up and left the trailer walking down the road. They

-2-

continued to drink and the defendant and Jackson began arguing about her possible involvement with Prince. The defendant struck Jackson with a .25 automatic pistol. Jackson went and took a shower. Burns wheeled himself into the kitchen to catheterize himself. Burns stated that he heard two or three shots and turned and saw Brom on the couch bleeding. The defendant was standing over by the door, but Burns did not see anything in the defendant's hands. Jackson came out of the bedroom and Brom got up to walk, not saying anything. Burns believed that the defendant called 911 and that the police arrived in approximately 10 minutes.

Burns stated that before the police arrived, the defendant wanted him to take the blame for shooting Brom, by him being in a wheelchair. Burns testified that the defendant cut him across the chest with a knife to make it look like self-defense. Upon their arrival, Burns told the police that he shot Brom. Later that night, Burns went to the hospital to seek medical treatment because the cut he received would not stop bleeding. Burns stated that shortly afterwards, he came to his senses and told the police he did not shoot Brom. He also told the defendant, "I wasn't going to say I shot anybody."

During cross-examination, Burns testified that the defendant shot into the ceiling with a .25 caliber automatic pistol, which was left by Prince. Burns stated that it was possible that he called his mother in Manchester, Tennessee, and told her that he shot Brom, but he denied that he told his mother that Brom was involved with what happened to his legs. Burns identified a statement that he gave to the police on January 3, 1998, in which he stated that he shot Brom. The statement was read to the jury. He also identified a statement given to the police on January 14, 1998, in which he stated, "I didn't shoot anybody."

Jody Sexton, a former deputy of the Williamson County Sheriff's Department, testified that he and Deputy Robert Durbin responded to a domestic call on Fisher Road in Williamson County on December 29, 1997, at approximately 11:00 p.m. While en route, the call was changed to a "shooting call." Both Sexton and Durbin parked near the driveway and approached the mobile home from a wooded area for officer safety reasons. Deputy Sexton stated that he saw the defendant coming around the side of the trailer. Deputy Durbin handcuffed the defendant because of the shooting call and because he did not know exactly what had happened in the trailer. Once inside the trailer, Deputy Sexton saw Jackson, Brom and Burns. Brom had been shot twice and Burns had a 12 inch cut across his chest. Deputy Sexton searched the trailer for a weapon but did not find one. The defendant was brought into the trailer and the handcuffs were taken off. When the defendant was asked what happened, he said "some person came inside yelling about his car. Burns was cut by this subject and Brom defended Burns and this person shot Brom in the head and chest." This unknown subject left through the rear door on foot. The defendant described the person as a white male, 5' 4", and weighing about 150 pounds. Deputy Sexton stated that he went outside and saw some prints in the snow and blood on the back porch. The tracks went about 50 yards into some woods and then returned going around the corner of the trailer. Deputy Sexton checked the cedar thicket and recovered a .22 caliber pistol, which contained three (3) spent rounds and two (2) live rounds. Deputy Sexton did not see any tracks leaving the trailer which lead to the roadway. While in the trailer, Deputy Sexton tagged one spent and one live .25 automatic round and also a pocket

knife which was found in Brom's front pocket. Deputy Sexton described Brom as drunk, incoherent, had slurred speech, and speaking nonsense. Brom refused treatment stating, "he wanted another beer."

Robert Durbin, a deputy of the Williamson County Sheriff's Department, testified that he and Deputy Sexton responded to a call on Fisher Road about 11:00 p.m. on December 29, 1997. Deputy Durbin stated that he parked his car, approached the trailer and saw a white male coming around the corner of the trailer. He identified himself and handcuffed the subject. Inside the trailer, Deputy Durbin saw a female, Burns was sitting with a cut across his chest in a wheelchair, and Brom had been shot twice. Deputy Durbin stated that Deputy Sexton asked the defendant what happened. The defendant testified that "Bruce had come in the trailer about a tow. He was drunk. An argument began, Bruce cut Burns and then shot Brom and left." Deputy Durbin went outside to the back of the trailer and saw a set of tracks leading into some woods. The tracks returned and went around to the corner of the trailer. Deputy Durbin identified a .22 caliber pistol found in the woods, which contained several empty shell casings and possibly one live round. During cross-examination, Durbin testified that he found a knife in the breast pocket of Brom's overalls.

Tony Phillips, a detective for the Williamson County Sheriff's Department, testified that he saw Brom at Vanderbilt Hospital on December 31, 1997. Phillips stated that afterwards he obtained an arrest warrant for the defendant. On December 31, 1997, Phillips obtained a statement from the defendant who said, "Burns shot Brom about an incident over Burns' loss of his legs." Phillips testified that he was aware that Detective Hagon had taken a statement from Burns on January 3, 1998. Phillips stated that he went on vacation about the middle of January and did not conduct any further investigation about the case. Phillips testified that the .22 caliber pistol was not tested to determine if that gun had fired any rounds.

Sean M. O'Brien, a corporal for the Williamson County Department Jail Center, testified that on July 5, 1998, there was an escape from the jail. O'Brien stated that during a medical visit to the cells he noticed a hole in one of the windows and found that the defendant and five other inmates had escaped. O'Brien believed that the defendant was caught three days later.

Lieutenant Derrell Cagle of the Williamson County Sheriff's Department, testified that he was notified that the defendant and six others escaped from jail on July 5, 1998. Lt. Cagle stated that he received information that the defendant could be found at a residence in Nashville. He stated that the defendant was found at this residence hiding on the roof. The defendant was apprehended and returned to Williamson County Jail. Lt. Cagle estimated that the defendant was gone for approximately four hours before he was arrested.

Frances Jackson testified that she has lived at 7925 Fisher Road, Primm Springs, Tennessee, for the past five (5) years and that the defendant lived with her for two (2) years. She stated that on December 29, 1997, the defendant and Burns left her trailer and returned with Brom and Prince. They smoked some marijuana and took some pills. She described them as drinking too much and

"rocking."[1] She does not remember arguing but the defendant hit her in the left eye with the .22 caliber pistol. She testified that her eye began bleeding so she took a shower. Jackson testified that while in the shower she heard two shots and thought it was "some guys just drinking and shooting." When she came out, she saw Brom lying on the floor. She lifted his head and discovered that he had been shot in the head. She helped pick Brom up and sat him in a chair. She said to Burns and the defendant, "there's three phones in the f—ing house and no one knows the number to 911." The defendant responded, "f—k the SOB, I hope he dies." Prince had already left before this happened. While Brom was sitting in the chair, the defendant went outside. After the paramedics had taken Brom, Jackson went to the bedroom to lay down and the defendant came in the bedroom and slapped her on the leg wanting to know where the gun was. Jackson testified that someone had cleaned up the trailer because she saw bloody water in the mop bucket. As to the knife found in Brom's pocket, she indicated that it belonged to her. She used this knife at work and when she got home she placed it on the counter. She saw Burns' cut after the paramedics had taken Brom.

During cross-examination, Jackson testified that she did not know of her own personal knowledge who shot Brom. She stated that the defendant used one of the trailer's bedrooms as an office in which he kept a .25 automatic pistol and her .22 caliber pistol locked in a desk. She described herself as being messed up and that Brom was both drinking and using drugs. She stated that after Brom was gone, Burns called his mother and told her that he shot Brom.

In his own defense, the defendant testified that he had no memory of what happened on the night of December 29, 1997. He does not believe that he shot Brom. The defendant stated that Burns shot Brom. In his testimony, the defendant corroborated much of the testimony of the State's witnesses in reference to the events leading up to the shooting of the victim. He stated that the reason they went to Brom's home was that Brom wanted to buy some pills and that Burns would sell the pills to Brom. The defendant stated that upon their return to the trailer, Burns and Brom had a discussion about Burns' paralysis. Burns told Brom that "Stormy Cochran" and four others, in Columbia, Tennessee, had beaten him with a baseball bat. In Burns' mind, Brom was one of the four who had beaten him. The defendant stated that Burns and Brom were arguing, so he went into the office and got his .25 automatic pistol and shot four (4) to five (5) times into the ceiling. They all got quiet. Prince left, then the defendant went outside and removed the .22 caliber pistol from his wrecker and placed it near the stereo when he came back inside the trailer. The defendant agreed that he struck Jackson with the .22 pistol, but it was accidentally. The defendant testified that he went to help Jackson, whose eye was bleeding, and while she was taking a shower, he heard two gunshots. When the defendant returned to the living room, he observed that Brom had been shot and asked Burns, "Why did you shoot Jimmy?" The defendant could not understand Burns' response. While Jackson was on the telephone with 911, the defendant told her, "We can't let the SOB die." While they were waiting for the ambulance, Burns called his mother. The defendant stated that he asked Burns where was the gun and Burns responded that he had thrown the gun out the back door. The defendant went outside to attempt to find the gun, but could not locate it. The defendant explained that the deputies implied that Prince must have shot Brom since he had left and that the

[1]This term refers to the use of rocks of crack cocaine.

defendant decided to go along with their implication. As to his escape from jail, the defendant stated that he observed two inmates sawing some bars on the window of their cell and broke out a window. The defendant decided to escape so that he could sell his wrecker and hire an attorney.

## SENTENCING HEARING

On February 1, 1999, the trial court conducted a sentencing hearing in which the only witness was the defendant. Apparently, between the defendant's convictions in October 1998, and the sentencing hearing, the defendant entered a plea of guilty to felony escape and requested a sentencing hearing to coincide with these convictions. The defendant acknowledged that the pre-sentence report was correct. He also acknowledged that he was convicted in the Williamson County Circuit Court on September 9, 1996, of DUI, 1st offense and Possession of Marijuana. The defendant was sentenced to eleven (11) months and twenty-nine (29) days for each offense, to run concurrently. After service of forty-five (45) days the defendant was placed on supervised probation. In addition, the defendant was fined three hundred and fifty dollars ($350.00) and two hundred and fifty dollars ($250.00). Also, the defendant confirmed that he had a DUI arrest in Columbia, Tennessee, in 1991. In 1993, the defendant was arrested and convicted in Little Rock, Arkansas, for battery, resisting arrest and carrying a weapon, which he indicated was a stick.

In its determination of a proper sentence, the trial court found three (3) enhancement factors; (1), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (6), the crime was committed under circumstances which the potential for bodily injury to a victim was great; and (10), the defendant had no hesitation about committing a crime when the risk to human life was high. In considering mitigation factors, the trial court found that mitigating factor (3) was applicable; substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense, but the trial court rejected mitigating factor (11), the defendant, although guilty of a crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. For the offense of attempted murder second degree, the trial court imposed a sentence of eleven (11) years in the Department of Correction. For the offense of assault, the trial court imposed a sentence of eleven (11) months and twenty-nine (29) days in the Williamson County Jail which sentence was to run concurrent with the attempted murder second degree offense. For the offense of escape, the trial court imposed a sentence of one (1) year to run consecutive to the offense of attempted murder second degree.

## LEGAL ANALYSIS
### Issue No. 1

In his first assignment of error, the defendant submits that the indictment (presentment) is defective in that the charging instrument, in count one, fails to charge an overt act as required by the attempt statute, Tenn. Code Ann. § 39-12-101. The State asserts that the presentment in this case charged the defendant with attempted first degree murder and, thus, conforms with constitutional and statutory requirements.

In the present case, the first count of the presentment alleges that:

> Arnold K. Ward, Jr., heretofore, to wit, on the 29th day of December, 1997, before the finding of this presentment, in the said County and State, unlawfully, feloniously, intentionally, and with premeditation, did attempt to kill another: James R. Brom, in violation of Tennessee Code Annotated § 39-13-202.

Our Criminal Attempt Statute, Tenn. Code Ann. § 39-12-101 states:

> (a) a person who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

An indictment (presentment) must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. *See* Tenn. Code Ann. § 40-13-202 (1990).

In *Wyatt v. State*, 24 S.W.3d 319 (Tenn. 2000), our Supreme Court addressed, in a denial of a petition for habeas corpus, the sufficiency of notice in an indictment for attempted murder first degree. His indictment states in pertinent part:

> that WILLIAM TERRY WYATT on the 7th day of March, 1994, in Cumberland County, Tennessee, and before the finding of this indictment, did unlawfully, intentionally, deliberately and with premeditation attempt to kill Billie Carey in violation of T.C.A. 39-12-101. . . .

The indictment did not specify a specific act or course of conduct constituting the "attempt to kill." Wyatt asserted that his conviction and sentence were void because the indictment failed to

allege an overt act, which is a material element of attempted murder first degree. Thus, the trial court had no jurisdiction. Since the defendant in this cause raised an identical issue the Supreme Court holding is determinative of this issue. The Supreme Court held:

> The form of an indictment is further governed by statute. Tenn. Code Ann. § 40-13-202 (1997). Section 202 requires that an indictment "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." *Id.* "Prolixity" means "[t]he unnecessary and superfluous statement of facts in pleading or in evidence." **Black's Law Dictionary 1378 (4th Ed. 1951)**. We consider the sufficiency of Wyatt's indictment with these constitutional and statutory principles in mind.
>
> We conclude that the indictment in this case satisfies these minimum requirements. Clearly Wyatt was placed on notice that he was charged with the intentional, deliberate and premeditated attempt to kill the named victim on a date certain. The indictment was also sufficient to place the trial court on notice that a judgment and sentence for attempted first-degree murder were proper upon conviction. Finally, by expressly stating that the attempt to kill was made against a specific victim on a date certain, the indictment offers Wyatt double jeopardy protection from any future charge of attempted murder against that victim on that date. Though the language "did … attempt to kill" is a general description, especially in light of the testimony at the preliminary hearing that Wyatt committed multiple acts against the victim which the State could have relied upon to obtain a verdict, this language alleges an act as required by the criminal attempt statute and was sufficient to notify Wyatt of the accused crime, to confer jurisdiction upon the trial court, and to protect against double jeopardy. *Hill*, 954 S.W.2d at 727.

*Wyatt v. State*, 24 S.W.3d at 324-325.

Further, the Supreme Court urged the State to charge, in the future, the crime of an attempt in such a way that informs the defendant of the precise act or acts against which he is being called upon to defend.

We hold that the presentment in this case sets forth sufficient notice to the defendant that he was charged with the offense of criminal attempt without the necessity of advising him of the exact overt act in attempting to kill the victim, Jimmy Brom. The proof established that after an argument, the defendant went into a bedroom, obtained a .22 caliber pistol, returned and shot the victim twice. Such conduct acts as a substantial step in the commission of the offense of attempted murder second degree. There is no merit to this issue.

**Issue No. 2**

In his second assignment of error, the defendant complained that he was denied his right to compulsory process for obtaining certain witnesses at his trial. The defendant asserts that the trial court refused him the right to subpoena Ritha Rinholt, William Strong, Bruce Prince, and Detective Hagon. In essence, these witnesses would have testified that Burns admitted shooting Brom. The State contends that the record does not support the defendant's contention.

In support of his argument in his brief, the defendant cites to the record from the videotape of his trial, (Videotape II, 10/29/98, 09:03:50). However, a review of the videotape record established a pre-trial conference between the defendant, his counsel, and the trial court in which his counsel made known to the trial court that the defendant was dissatisfied with counsel's representation. Apparently, the defendant had instructed defense counsel not to present a certain defense. The trial court went over the list of witnesses subpoenaed for trial in the defendant's presence. (Videotape II, 10/29/98, 09:07:15). The record does not establish that the defendant requested a continuance to secure the presence of additional witnesses. The other citations to the record by the defendant relate to jury voir dire and the questioning of Detective Tony Phillips in regards to the defendant's statement. We agree with the State that the defendant has waived this issue for failure to provide proper citations to the record. *See* Tenn. R. Crim. App. 10(b).

Defendants have a constitutional right to compulsory process under both the United States Constitution and the Tennessee Constitution. The constitutional right to compulsory process requires the trial court to issue process "for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible." *State v. West,* 767 S.W.2d 387, 401 (Tenn. 1989).

Although the defendant wished to present these missing witnesses to show that Burns admitted shooting Brom, there was ample evidence introduced at trial through various witnesses that Burns had made such admissions at the time of the shooting, but recanted such statements before the jury. In the present case, the defendant has failed to show that the trial court denied him compulsory process. We find no merit to this assignment of error.

**Issue No. 3**

In his third assignment of error, the defendant asserts extra-judicial communication occurred during the trial between a witness and a juror, thus contaminating the proceedings. In his brief, the defendant contends that he spoke to Frances Jackson on November 1, 1989, by phone, and that Ms. Jackson stated that she had spoken to a juror during a recess. According to Ms. Jackson, she made a negative comment concerning the defendant's "temper." The defendant concedes that he was unaware if such information had been presented to the trial court. We agree with the State that the record does not reveal such occurrence was brought to the trial court's attention at a motion for a new trial. Tenn. R. App. P. 3(e), in pertinent part provides:

Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Thus, the defendant is not entitled to any relief not raised below. There is no merit to this issue.

## Issue No. 4

In his fourth assignment of error, the defendant asserts that there was insufficient evidence for which a rational trier of fact could have found the defendant guilty of attempted murder second degree. The State counters there is ample evidence in the record to support the defendant's convictions.

Following a jury conviction, the initial presumption of innocence is removed from the defendant and exchanged for one of guilt, so that on appeal, the defendant had the burden of demonstrating the insufficiency of the evidence. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). It is the duty of this Court to affirm the conviction unless the evidence adduced at trial was so deficient that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). In *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), *perm. app. denied,* (Tenn. 1990), this Court held this rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct evidence and circumstantial evidence.

This Court does not reweigh or reevaluate the evidence, nor may we replace our inferences for those drawn by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368 (1993). A jury verdict accredits the testimony of the State's witnesses and resolves all conflicts in favor of the State's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn. 1983).

Although the defendant was charged with attempted murder first degree, the jury in its discretion, based upon the evidence and jury instructions, found the defendant guilty of attempted murder second degree. Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210 (1997). "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. *See* Tenn. Code Ann. § 39-11-302(b)(1997). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* One commits second degree murder if one knowingly

tries to kill another and succeeds in doing so. *See State v. Bryant,* 1999 Lexis 16, No. 02C01-9707-CR-00286, 1999 WL 5633, at *6 (Tenn. Crim. App. Jan. 8, 1999), *perm. app. denied,* (Tenn.1999). Thus, attempted murder second degree may be proven by showing that the defendant "intentionally acted with the requisite culpability to commit the offense of murder second degree. . . if he had actually killed the victims." *State v. Nolan,* 1997 Lexis 597, No. 01C01-9511-CC-00367, 1997 WL 351142 at *22 (Tenn. Crim. App. June 26, 1997), *perm. app. denied*, (Tenn. 1998).

The evidence in this record established that the defendant and the victim had an argument over the defendant's "operation of his business." Prior to this argument, the defendant and Prince had some words and the defendant shot twice into the ceiling with a .25 automatic pistol. After the argument with the victim, the defendant went into a bedroom and obtained a .22 caliber pistol and shot the victim once. The defendant told the victim, "I'll blow your M-F head off again." The defendant shot the victim a second time. This bullet lodged in the victim's chest next to his heart. After the incident, the defendant persuaded Burns to take the blame for shooting the victim. Burns admitted telling Detective Hagon that he shot the victim, but recanted this testimony at trial. Although the defendant denied hiding the .22 caliber pistol outside the trailer, law enforcement officers found only one set of prints in the snow leading from the trailer to the woods. The defendant admitted that he had gone outside, but for other reasons. Also, the jury had the benefit of Deputies Sexton's and Burton's testimonies, stating that the defendant said Prince shot the victim and left walking from the trailer.

Despite the defendant's arguments about inconsistencies in the testimony, the jury resolved all conflicts in favor of the State, as was their prerogative. We find that the evidence is amply sufficient to support the defendant's conviction for attempted murder second degree. There is no merit to this argument.

### Issue No. 5

In his fifth assignment of error, the defendant contends that criminal attempt requires a specific intent to commit the particular offense, while second degree murder is not a specific intent crime. Therefore, the attempt to commit murder second degree is not cognizable as an offense under Tennessee law. The State differs and asserts that the offense of attempted murder second degree is firmly established in this state.

In *State v. Kimbrough,* 924 S.W.2d 888, 890 (Tenn. 1996), our Supreme Court held that the specific intent required by the criminal attempt statute was inconsistent with felony murder because attempt requires a specific intent, and one cannot intend to commit an unintentional act. This Court has noted, with regards to attempted murder second degree, that the mental states of intentional or knowing both "involve a level of conscious awareness and volitional, affirmative conduct." *See State v. Palmer,* 10 S.W.3d 638, 644 (Tenn. Crim. App. 1999); *State v. Nolan,* No. 01C01-9511-CC-00387, 1997 WL 351142 (Tenn. Crim. App. June 26, 1997). Likewise, this Court recognized that the offense of attempted murder second degree exists in Tennessee. *State v. Palmer, Id.; State v. Bryant,* No. 02C01-9707-CR-00286, 1999 WL 5633 (Tenn. Crim. App. Jan. 8, 1999); *State v.*

*Eldridge,* 951 S.W.2d 775, 779 (Tenn. Crim. App. 1997) (upholding jury instruction on attempted second degree murder); *Grant C. Ivey v. State,* No. 02C01-9801-CC-00052, 1999 WL 228271 (Tenn. Crim. App. Apr. 20, 1999) (holding that retrial for attempted second degree murder did not violate double jeopardy); *State v. Porter,* No. 03C01-9606-CC-00238, 1997 WL 661419 (Tenn. Crim. App. Oct. 24, 1997) (holding evidence was sufficient to support attempted murder second degree conviction).

In *State v. Cribbs,* 967 S.W.2d 773, 782-3 (Tenn. 1998), our Supreme Court, in a death penalty case, addressed the question of using convictions involving attempted second degree murder as aggravating circumstances. The Supreme Court agreed with the Court of Criminal Appeals holding that the attempt statute requires the perpetrator to act "with the kind of culpability otherwise required for the principal offense." Tenn. Code Ann. § 39-12-101(a)(1997 Repl). The Supreme Court held the classification of attempted second degree murder as one of whose statutory elements involve the use of violence to the person.

We hold that an attempt to commit second degree murder is a criminal offense in Tennessee. There is no merit to this issue.

**Issue No. 6**

In his sixth assignment of error, the defendant asserts that his sentence is excessive in applying two enhancement factors, Tenn Code Ann. §§ 40-350114(1) and (6). However, the defendant does not challenge the trial court's determination that enhancement factor (10), the defendant had no hesitation in committing a crime in which the risk to human life was high. The State contends that the trial court's judgment is correct.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). The burden is now on the defendant to show that the sentencing was improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

When conducting a *de novo* review of the sentence, this Court must consider: (a) the evidence, if any, received at trial and or sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel as to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any statutory mitigating and enhancement factors; (g) any statements made by the defendant in his own behalf; and (h) the defendant's potential or lack of

potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102-103, -210; *State v. Smith,* 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). Since the defendant was convicted of attempted second degree murder, which is a Class B felony, the defendant is not presumed to be a favorable candidate for an alternative sentence option. *See* Tenn. Code Ann. § 40-35-101(6). Should there be enhancement and mitigating factors for a Class B felony, the trial court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). The applicable range of punishment for the defendant's conviction of attempted second degree murder is eight (8) to twelve (12) years, Range I, standard offender.

First, the defendant complained that the record does not support the trial court's finding that Tennessee Code Annotated § 40-35-114(1); the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, in that the pre-sentence report does not reveal a history of criminal behavior. However, the evidence at the defendant's sentencing hearing clearly established that enhancement factor (1) is applicable. The defendant's own testimony established that he had two previous convictions for DUI, a conviction for possession of marijuana, which he had taken into a jail, and three convictions in the State of Arkansas, for battery, resisting arrest and carrying a weapon. On the day of the incident, the testimony at trial clearly revealed that the defendant had been consuming and participating in drug usage. Likewise at the sentencing hearing, defense counsel for both the offense of attempted second degree murder and escape, conceded that enhancement factor (1) was applicable. The record amply supports the trial court's application of enhancement factor (1).

The defendant contends that the trial court erred in applying enhancement factor (6), the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great. The defendant argues that the infliction of serious bodily injury upon another person does not apply when sentencing for the offense of attempted murder, citing *State v. Makoka,* 885 S.W.2d 366 (Tenn. Crim. App. 1994). Further, the defendant would argue that there is no medical testimony that a non-removable bullet creates a significant health hazard to the victim or that the victim's wounds were life threatening. The defendant's citation to *State v. Makoka* is misplaced. In *Makoka,* this Court addressed the application of enhancement factor (11), the felony resulted in death or bodily injury or involved the threat of death of another person and the defendant has previously been convicted of a felony resulted in death or bodily injury for convictions for attempted murder first degree and attempted murder second degree.

We agree with the State that enhancement factor (6) is applicable to the facts in this case. In *State v. Nix,* 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995), *perm. app. denied,* (Tenn.1996), this Court held that relative to attempted murder first degree, particularly great injuries are not essential to the commission of the offense. This would be true for the offense of attempted second degree murder. The evidence at trial revealed that the victim was shot twice, once in the lung in which the bullet was lodged next to the heart and could not be removed without endangering the life of the victim. The other wound was to the victim's head, fortunately for the victim the bullet proceeded around the skull and exited the rear of the victim's head. At the time of the sentencing hearing, the

victim had incurred twenty thousand and three hundred dollars ($20,300.00) in medical expenses and substantial loss of wages. He still suffers from breathing difficulties, daily headaches and nightmares.

Although the trial court did not find that enhancement factor (9), the defendant possessed a firearm during the commission of the offense, this Court, in its *de novo* review, finds this enhancement factor applicable to the defendant's conviction.

We hold that the trial court did not err in applying the enhancement factors as set forth in this record. The trial court's assessment of a sentence of eleven (11) years for the offense of attempted second degree murder and eleven (11) months and twenty-nine (29) days for assault were proper. There is no merit to this issue.

The trial court's judgment is affirmed.

_____
L. TERRY LAFFERTY, SENIOR JUDGE